UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 18-CV-81117-SMITH
MAGISTRATE JUDGE REID

KIRBY C. WRIGHT,

      Petitioner,

v.

MARK S. INCH,[1]

      Respondent.

_____/

## REPORT OF MAGISTRATE JUDGE

### I. Introduction

The Petitioner, **Kirby Wright**, has filed this *pro se* petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the constitutionality of her conviction for first degree murder, entered following a jury verdict in Palm Beach County Circuit Court, Case No. 2010-CF-006149AXX. For the reasons detailed below, the Petitioner is not entitled to habeas corpus relief.

This cause has been referred to the undersigned for consideration and report, pursuant to 28 U.S.C. § 636(b)(1)(B), (C); S.D. Fla. Local Rule 1(f) governing Magistrate Judges and S.D. Fla. Admin. Order 2019-02. [ECF 2; 12].

_____

[1]Pursuant to Fed. R. Civ. P. 25(d), since Mark S. Inch has replaced Julie Jones as the Secretary of the Florida Department of Corrections, he is substituted as the proper respondent in this case.

For its consideration of the petition [ECF 1], the court has the Respondent's response to this court's order to show cause [ECF 8], along with its supporting appendix [ECF 9; 10], containing copies of relevant state court pleadings, including hearing and trial transcripts.

## II. Claims

Construing the arguments liberally as afforded *pro se* litigants, pursuant to *Haines v. Kerner*, 404 U.S. 519, 520 (1972), the Petitioner raises the following grounds for relief:

1.  Her right to a fair trial was violated when the trial court erred by denying her motion for judgment of acquittal. [ECF 1, p. 5].

2.  Her right to a fair trial was violated when the trial court erred by denying her motion to dismiss pursuant to Florida's "Stand Your Ground" law. [ECF 1, p. 6].

3.  Her right to a fair trial was violated when the trial court erred by improperly instructing the jury. [ECF 1, p. 7].

4.  She received ineffective assistance of counsel when her lawyer stipulating to the edited 911 call. [ECF 1, p. 8].

5.  She received ineffective assistance of counsel when her lawyer failed to request both 911 calls be played in their entirety. [ECF 1, p. 10].

6.  She received ineffective assistance of counsel when her lawyer failed to object to the prosecutor's improper comments during closing argument. [ECF 1, p. 11].

7.  She received ineffective assistance of counsel due to the cumulative effect of her lawyer's errors at trial. [ECF 1, p. 12].

8.      She received ineffective assistance of counsel when her lawyer
        failed to object to the court sustaining an objection the state never
        made to the second portion of her taped statement. [ECF 1, p.
        14].

9.      She received ineffective assistance of counsel when her lawyer
        failed to:

        a.  question Ernest Coney about moving Antonio Bannister's
            body; and,

        b.  moving for a mistrial. [ECF 1, p. 15].

10.     She received ineffective assistance of counsel when her lawyer
        failed to strike four jurors for cause. [ECF 1, p. 17].

11.     She received ineffective assistance of counsel when her lawyer
        failed to move to disqualify the trial judge from her case. [ECF
        1, p. 18].

12.     She received ineffective assistance of counsel when the
        cumulative effect of counsel's errors deemed the trial
        fundamentally unfair. [ECF 1, p. 19].

### III. Procedural History

In 2010, Petitioner was charged by indictment with premeditated first-degree

murder of Antonio Bannister with a firearm. [ECF 9-1, Ex. 1]. Petitioner failed a

pre-trial motion seeking dismissal of the indictment and immunity from prosecution

pursuant to Florida's "Stand Your Ground" law, codified as Fla. Stat. § 776.032.

[*Id.*, Ex. 2]. After holding an evidentiary hearing on the motion, the trial court denied

it, finding that Petitioner failed to meet her burden of proof. [ECF 10-1, p. 110]. The

case then proceeded to trial, after which the jury found Petitioner guilty as charged.

[ECF 9-1, Exs. 3, 4]. Petitioner was immediately sentenced to life imprisonment without the possibility of parole. [*Id*., Ex. 5].

Petitioner prosecuted a direct appeal raising the following claims: (1) the trial court erred by denying her motion for judgment of acquittal, (2) the trial court erred by denying her "Stand Your Ground" motion, and (3) the trial court erred by improperly instructing the jury. [ECF 9-1, Ex. 6]. After the State filed its answer brief [*Id*., Ex. 7], the Fourth District Court of Appeal ("Fourth DCA") issued its *per curiam* affirmance without written opinion. *Wright v. State*, 162 So.3d 1028 (Fla. 4th DCA 2015) (table). Petitioner's motion for rehearing was denied on April 23, 2015. [ECF 9-1, Ex. 8].

On May 10, 2016, Petitioner filed a motion for postconviction relief pursuant to Fla. R. Crim. P. 3.850, where she raised the following grounds for relief: (1) counsel was ineffective for stipulating to 911 calls; (2) counsel was ineffective for failing to request both 911 calls be played to the jury in their entirety; (3) and (4) counsel was ineffective for failing to object to the prosecutor's improper and prejudicial comments during closing argument; (5) counsel was ineffective for failing to object to the court sustaining an objection the state never made to the second portion of Petitioner's taped statement; (6) counsel was ineffective for failing to question Ernest Coney about moving Antonio Bannister's body, and for failing to move for a mistrial; (7) counsel was ineffective for failing to strike four jurors for

cause; (8) counsel was ineffective for failing to move to disqualify the trial judge; and, (9) the cumulative effect of counsel's errors rendered her trial fundamentally unfair. [ECF 9-1, Ex. 9]. The trial court denied the motion for the reasons set forth in the State's response. [*Id.*, Exs. 10-11]. Petitioner appealed, and on June 7, 2018, the Fourth DCA issued its *per curiam* affirmance of the order denying relief. [*Id.*, Ex. 12]; *see also Wright v. State*, 248 So.3d 1153 (Fla. 4th DCA 2018) (table). The mandate issued on August 17, 2018. [ECF 9-1, Ex. 14].

Prior to the issuance of the mandate above, Petitioner came to this Court, filing her habeas petition pursuant to 28 U.S.C. § 2254 on August 9, 2018. [ECF 1].

### IV. Threshold Issues

A. Timeliness

Careful review of the procedural history of this case confirms that less than one year of un-tolled time expired after the Petitioner's judgment became final and the filing of this federal habeas petition. Therefore, as the Respondent correctly concedes [ECF 8, p. 6], the petition is timely filed under 28 U.S.C. § 2244(d).

B. Exhaustion

Next, the Respondent argues that the first three of Petitioner's claims, which involve trial court error, are unexhausted and procedurally defaulted from federal habeas review because they were never presented to the state court in federal constitutional terms. [ECF 8, p. 11]. In addressing the issue of exhaustion and

procedural default, the court must determine whether the claims raised here were raised in the state court proceedings, and whether the state courts were alerted to the federal nature of the claims.

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all available state court remedies. See 28 U.S.C. §§ 2254(b), (c). To properly exhaust state remedies, the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples,* 489 U.S. 346, 351 (1989); *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 456–59 (11th Cir. 2015).

Exhaustion is not satisfied "merely" if the petitioner presents the state court with "all the facts necessary to support the claim" or even if a "somewhat similar state-law claim was made." *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004) (citation omitted). A petitioner must instead "present his claims to the state courts such that they are permitted the 'opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Id.* For example, "[A] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin,* 541 U.S. at 32; *McNair v. Campbell,* 416 F.3d 1291, 1302-1303 (11th Cir. 2005).

To circumvent the exhaustion requirement, Petitioner must establish that there is an "absence of available state corrective process" or that "circumstances exist that render such process ineffective to protect [his] rights." 28 U.S.C. § 2254(b)(1)(B); *see Duckworth v. Serrano,* 454 U.S. 1, 3 (1981).

Here, the Respondent asserts that **claims 1, 2, and 3** of Petitioner's petition are unexhausted because she failed to raise the federal constitutional terms presented here in state court. [ECF 8, p. 11]. Petitioner argues, in a conclusory fashion, that the claims were properly exhausted because they "demonstrate a clear violation" of her constitutional rights. [ECF 11, p. 3]. Review of the record reveals that while Petitioner argued claim 3 in federal constitutional terms by asserting that the trial court's erroneous instructions "denied [her] due process and a fair trial under the Fourteenth Amendment[] of the United States Constitution," [ECF 9-1, Ex. 6, p. 57], she raised claims 1 and 2 only as issues of state law, supported only by citation to Florida cases and rules. Accordingly, claims 1 and 2 are unexhausted. *See Duncan v. Henry,* 513 U.S. 364, 366 (1995) (claim of evidentiary error not exhausted for purposes of federal review where presented to the state courts only as a violation of state law, and not expressly as a violation of due process guaranteed by the Fourteenth Amendment). Nevertheless, the Respondent's exhaustion argument as to claim 3 is not well-taken, as it appears that Petitioner sufficiently alerted the state

court to the federal nature of his claim on direct appeal. Therefore, the Court considers claim 3 ripe for habeas review.

C. Procedural Default

It must next be determined whether Petitioner's failure to exhaust **claims 1 and 2** results in a procedural default in federal court. Here, Petitioner's unexhausted claims would now be procedurally barred if raised in the state forum because she has already completed a direct appeal and her Rule 3.850 motions. *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11th Cir. 1999). In this case, a future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Id.* at 1303.

However, a procedurally defaulted claim may still be considered if the federal petitioner can demonstrate: (1) objective cause for the failure to properly present the claim and actual prejudice from the alleged constitutional violation; or, (2) a fundamental miscarriage of justice. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977); *Tharpe v. Warden,* 898 F.3d 1342, 1344-47 (11th Cir. 2018). The Petitioner can show cause by alleging that some objective factor, external to the defense, impeded his effort to raise the claim properly in the state court. *See Murray v. Carrier,* 477 U.S. 478, 488, (1986); *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To show prejudice, a petitioner must demonstrate that the "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental

fairness." *See McCoy v. Newsome,* 953 F.2d 1252, 1261 (11th Cir. 1992) (*quoting Murray,* 477 U.S. at 494). The allegations of cause and prejudice must be factually specific, not conclusory. *Harris v. Comm'r, Ala. Dep't of Corr.,* 874 F.3d 682, 691 (11th Cir. 2017).

Here, Petitioner fails to make any showing of cause and prejudice to excuse the procedural default of claims 1 and 2 in this habeas petition, nor does she make any showing of actual innocence. To the extent that Petitioner suggests, in objections or otherwise, that she is entitled to excuse the procedural default of her claims on the basis of the Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. 1 (2012), such a claim is without merit because *Martinez* applies to collateral review proceedings, and not to direct appeal claims. *See Lambrix v. Sec'y, Fla. Dep't of Corr.,* 756 F.3d 1246, 1261 n.31 (11th Cir. 2014).

Likewise, if Petitioner means to excuse the procedural default of these claims by asserting that appellate counsel was ineffective because they failed to raise the claims on direct appeal, that claim is also without merit. Claims of ineffective assistance of appellate counsel must be raised by petition for writ of habeas corpus in the appropriate district court of appeal. *See State v. Dist. Ct. of Appeal, First Dist.,* 569 So. 2d 439, 442 n.1 (Fla. 1990) (superseded on other grounds by *Baker v. State*, 878 So.2d 1236 (Fla. 2004). There is no record of Petitioner filing an ineffective assistance of appellate counsel petition in the Fourth DCA.

Accordingly, Petitioner's claims 1 and 2 are defaulted from federal habeas review and should not be considered on the merits.

## V. Statement of Facts[2]

In 2010, Petitioner and Ezekiel Lott, a/k/a Zeek, were best friends [Vol. 5, T. 883, 940]. On May 25, 2010, Zeek went to Petitioner's partner's house to find her [*Id.,* T. 887-888]. Petitioner and Zeek were chilling on the back steps, smoking weed when their friend, Broderick, came by around eight p.m. [*Id.,* T. 890], and asked if Petitioner and Zeek wanted "to go to a party" [*Id.*, T. 888].

Petitioner, Zeek, Broderick and his girlfriend walked over to Antonio Bannister's house [*Id.*, T. 892]. At the house, Antonio and his wife, Broderick and his girlfriend, Petitioner and Zeek [*Id.* T. 907] were all just "chilling, having a couple of drinks" [*Id.*, T. 892]. Ernest Coney, (nicknamed Peanut) who on May 2010 was 11 years old [Vol. 3, T. 684], and was Antonio's stepson, was in his room, playing video games [*Id.*, T. 687].

After drinking and smoking weed, Antonio (also referred to as Victim) suggested they go fishing [Vol. 5, T. 907], and brought his step-son fishing with them [Vol. 4, T. 691; Vol. 5, T. 907]. Antonio, Broderick, Zeek, Petitioner and Peanut all walked together from Antonio's house down to Currie Park to go fishing,

---

[2] For purposes of this Report, when referring to the trial transcript, the Court uses the numbering system used by the Respondent in its response. [ECF 8]. The majority of the statement of facts are taken from the Appellee's brief on appeal.  [ECF 9-1, Ex. 7].

around one or two in the morning [Vol. 4, T. 700; Vol. 5, T. 907]. Since they were at Antonio's house, Antonio got fishing gear for everyone [Vol. 3, T. 694]. During the walk no one was fighting or picking on each other; no kind of issues going on between anyone; everyone was getting along [Vol. 3, 694; Vol. 4, T. 702; Vol. 8, T. 1560, 1561], everyone was "just enjoying themselves" and having a good time [Vol. 5, T. 910]; no fighting, or arguing; no one "picking on someone else" [Vol. 8, T. 1561].

After fishing for 45 minutes or an hour [Vol. 4, T. 702; Vol. 5, T. 910; Vol. 8, T. 1561], and not catching any fish, they decided to walk home [Vol. 4, T. 703, T. 705; Vol. 5, T. 911]. During the time they were on the pier fishing, everybody was getting along [Vol. 4, T. 703]. Zeek did not know Petitioner was carrying a gun; Zeek did not see Petitioner with a gun that night [Vol. 5, T. 908]. Zeek did not see Antonio (the victim) with any weapons [*Id.*, T. 909]; nor did Zeek see or hear Antonio threaten anybody [*Id.*, T. 909]. They were all walking together. Before the shooting, there were no arguments; and Petitioner and the victim were not yelling at each other [*Id.*, T. 912].

At trial, Broderick Anthony (hereinafter Broderick), testified that on the way back from fishing at the park, Peanut was walking in the front [Vol. 8, T. 1563]; followed by Antonio and Broderick; and Petitioner and Zeek were in the back [*Id.*, T. 1562]. Because Petitioner and Zeek were falling far behind, Antonio turned and

11

told Petitioner and Zeek to catch up [*Id.*, T. 1562-63]. Soon after that, Petitioner came up behind Broderick, tapped Broderick on the shoulder and told Broderick to "fall back" [*Id.*, T. 1563]. Broderick did not ask why, he just did it [*Id.*, T. 1563]. Broderick fell back and started walking with Zeek [*Id.*, T. 1565]. As Broderick was walking with Zeek, Broderick saw "a flashing light," and "heard a gunshot" [*Id.*, T. 1565]. Since Broderick did not know where the shot came from, he fell to the ground [*Id.*, T. 1565].

When Broderick looked, he saw Antonio on the ground, trying to "get up" [*Id.*, T. 1566]; "it looked like he [Antonio] was about to get up" [*Id.*, T. 1579]; then Broderick heard another shot, so he fell again [*Id.*, T. 1566]. Broderick testified there were five to ten seconds between shots [*Id.*, T. 1567]. Broderick said he did not know where Petitioner or Zeek were at that point [*Id.*, T. 1566]; Peanut was behind Broderick [*Id.*, T. 1566]; and then Broderick heard Peanut screaming [*Id.*, T. 1566]. Broderick stayed down five to ten seconds, and then he saw that everyone was gone, except for Peanut [*Id.*, T. 1567].

Broderick ran towards the train tracks [*Id.*, T. 1567]. Broderick saw Petitioner and Zeek by the train tracks; they told Broderick, "better not say anything" [*Id.*, T. 1568]. Upon hearing this, Broderick just took off toward his house [*Id.*]. On his way, he stopped by Antonio's house to pick up his girlfriend, and then left, without calling

the police [*Id.*, T. 1576], nor saying anything to Antonio's wife because he thought he was "hallucinating" or "imagining stuff" [*Id.*, T. 1569].

Broderick testified that during the walk after fishing, he did not see Antonio picking on Petitioner, hitting her, or doing anything to Petitioner [*Id.*, T. 1570]. Broderick testified he did not see Antonio put his arms around Petitioner [*Id.*, T. 1566, 1571]. The police made contact with him around 8 or 9 a.m., at which time Broderick gave a statement to the police [*Id.*, T. 1571]. In his statement to police, Broderick said that he saw Petitioner standing next to Antonio, or over him [*Id.*, T. 1586].

The victim's son, Peanut, testified that on their walk back from fishing, at first they were all together [Vol. 4, T. 706], there were no arguments going on [*Id.*, T. 707]; and Peanut did not see his father, Broderick or Zeek picking on Petitioner [*Id.*]. Then, when they were almost to the park, Petitioner and Zeek dropped back behind the group [*Id.*, T. 706-707]. At that point, Peanut was walking next to his father [*Id.*, T. 706], Petitioner was in the back, and Zeek was "way in the back", and Broderick was in front [*Id.*].

As Peanut was walking, he heard a shot and everybody dropped to the ground [Vol. 4, T. 707-708]. Peanut did not see where the first shot came from [*Id.*, T. 708]. When Peanut looked over he saw his father "trying to get up a little bit," [*Id.*, T. 708]. His father was "trying to get back up, but couldn't" [*Id.*, T. 709]. Peanut then

13

saw Petitioner "holding the gun" [*Id.*, T. 709]; Petitioner pointed the gun and then she shot Antonio a second time [*Id.*, T. 708, 709, 711]. Petitioner was near the victim's head, when Petitioner shot him the second time [*Id.*, T. 737]. Petitioner pointed the gun "like towards his head" [*Id.*, T. 737]. Petitioner did not drop the gun [*Id.*, T. 737]. After the second shot, Petitioner just started running [*Id.*, T. 711]. Peanut got up and started running back into the park, "then Zeek and the others said, 'we're going off to get some help'" and they never returned, leaving Peanut alone [*Id.*, T. 708, 711]. When Peanut saw they all left, Peanut went over to check on his father, and "turned him over" [*Id.*, T. 712]. When Peanut first saw his father [the victim], his father was "kind of on his side"; his father did not say anything [*Id.*, T. 712].

Peanut then ran almost to the gym of the elementary school [*Id.*, T. 713-14]. When Peanut saw a lady looking out the window, he asked her to call the police [*Id.*, T. 714]. When the police arrived, Peanut took them to where his father was [*Id.*, T. 715]. Later that morning, the police took Peanut to Child Protection Services [Vol. 6, T. 1106], where Peanut's statement was videotaped and recorded [Vol. 4, T. 716]. The police also showed Peanut a photo lineup [*Id.*, T. 716-17]. Peanut circled Petitioner's photo as the person who shot his father [Vol. 4, T. 717-18; Vol. 6, T. 1111-1112].

14

At trial, Peanut testified that at no time did he see his "father messing with K.C. [Petitioner]" [Vol. 4, T. 719]. Peanut did not see his father put Petitioner in a bear hug, nor did he see them "wiggling around or horse-playing or anything of that nature" [*Id.*].

At trial Zeek, Petitioner's best friend, testified that after not catching anything, it started to get boring, so they decided to leave [Vol. 5, T. 911]. While they were walking back, just before the shooting, there were "no arguments," no one was yelling at each other; and Petitioner and the victim were not yelling at each other [*Id.*, T. 912].

Zeek testified that before the shooting, he was in the back of the group; Broderick "was a little bit in front" of Zeek; and Antonio [the victim] was on the sidewalk *behind* K.C. [Petitioner]; and Peanut was walking in front of Broderick [*Id.*, T. 913]; Peanut was "not really" close to his dad [the victim] [*Id.*, T. 915]. And Petitioner was walking in front of everybody [*Id.*]. Antonio, the victim, was holding a bucket and a fishing pole in his hands [*Id.*, T. 918].

Zeek, Petitioner's best friend, was the only person to testify that while he was staying behind everyone, "doing something" [*Id.*, T. 916], he looked up and saw Petitioner and Antonio "playing" [*Id.*]. They were "like wrestling," and Petitioner was screaming, "let me go" [*Id.*]. Zeek did not do anything to help his best friend, because he thought "they was playing" [*Id.*, T. 917]; "they were both drunk, and…

15

just chilling, so I'm thinking they playing" [*Id.*]. But "that's when I heard the gunshots, and I took off running" [*Id.*].

Zeek testified he heard two shots, so he ran because he did not want to get shot; Zeek did not know who had a gun, who was shooting [Vol. 5, T. 917]. Zeek testified he heard the first shot and ran; he was "not too far" before he heard the second shot [*Id.*, T. 932]. The shots were "like a half a second apart, two second apart probably" [*Id.*, T. 931]; he had taken two or three steps between shots [*Id.*, T. 932]. In a prior statement, Zeek said he "got ten feet away and [then] heard another" [shot] [*Id.*, T. 935]. When Zeek heard the shots, Zeek ran "west going home" [*Id.*, T. 918]; Zeek ran pass everybody [*Id.*, T. 935]; he did not stay to see who was hurt or what [*Id.*, T. 918-919]. Zeek was going home, but ended up in "Pleasant City in the cut" [*Id.*, T. 919].

When Zeek ran when he heard the shots, he was going home, "but then K.C. [Petitioner] caught up with" him [*Id.*, T. 936]. As they were running, Zeek and Petitioner turned into "Pleasant City" [*Id.*]; Petitioner asked Zeek "come with me" [*Id.*, T. 937], so they ran together [*Id.*, T. 938], and ended sitting between the field there; "in the cut's right there" [*Id.*, T. 939]. At trial, Zeek testified that he did not see the gun; and he did not ask Petitioner where the gun was [*Id.*, T. 940]. Zeek testified he asked "what happened?" but then they just sat and Zeek and Petitioner, his best friend, did not say anything to each other for a while [*Id.*].

16

Zeek and Petitioner stayed at the "cut" "until about like 6", six or seven in the morning [*Id.*, T. 952]. They were "hiding out in the cut" [*Id.*, T. 953]; according to Zee, they were not hiding from the police [*Id.*], "just scared so we just like stayed out of sight" [*Id.*, T. 954]. When Zeek asked Petitioner, "what happened?" Petitioner said, "I did it"; Petitioner just let Zeek know; Petitioner said, "I did it, I did it, I did what I had to do" [*Id.*]. Zeek testified that K.C. [Petitioner] did not tell him, "why she would have been mad at Antonio" [victim] [*Id.*, T. 964]. Zeek did not ask any more questions of Petitioner [*Id.*, T. 956].

After a while of hiding, Petitioner called her cousin, who picked them up, and took them to her house [*Id.*, T. 957, 960]. Later that day, Petitioner's cousin said Petitioner and Zeek had to turn themselves in, so the cousin took them to the police station [*Id.*, T. 963].

Petitioner, accompanied by her father, her cousin and Zeek [Vol. 6, T. 1118], turned herself in to the West Palm Beach Police Station around three or four o'clock in the afternoon of May 26, 2010 [*Id.*, T. 1116-17]. Detective Dennis Hardiman first spoke with Zeek [*Id.*, T. 1120-21]. Then Det. Hardiman took Petitioner into an interview room, and video and audio recorded Petitioner's interview [*Id.*, T. 1118].

Petitioner's taped statement was admitted into evidence, and published to the jury [*Id.*, T. 1127, T. 1130-1201]. In her statement to the police, Petitioner related her version of the events as follows:

THE DEFENDANT: So we're fishing and everybody's having good time or whatever, but he's still fucking with me like picking at me like pointing at me and not – not picking at me, but like you know trying me or whatever. . . .

THE DEFENDANT: So I'm like you know I'm not really feeding into it that much, I'm not paying that much attention to it or whatever. But at the end of the day we getting ready to come home or whatever, and I'm like he's still fucking with me, but this time he grabs me and I can't get loose. . . .

THE DEFENDANT: And I'm like I have the gun on me, but nobody knows that, only I know it because I carry it because I mean (sighs) you never know what -- whatever what can go on. So he grabbed me, and I couldn't get loose. . . .

THE DEFENDANT: Like I feel like I'm a female and you just don't know like what happened in Dunbar or whatever. So I try to protect myself because I (emotional) I don't want to shoot, I was scared, and I feel like I was scared. He grabbed me like and I couldn't get loose, and by the time I did like started wrestling with him I just reached for the gun and I shot twice, and I took off. I ran. And I caught up with Zeek, and everybody else ran. And I caught up with Zeek and we just stuck together like just stayed together. . . .

[*Id.*, T. 1142-43].

Petitioner confirmed that while they were fishing, "everybody's getting along" [*Id.*, T. 1146]; but she was staying mostly with Zeek [*Id.*]. Petitioner then again tells the police:

THE DEFENDANT: But except for on the way home like he was in the back. Him, Broderick and uhm -- Peanut they were like behind me, and Antonio -- I was walking like kind of right next to him and then I kind of got in front of them, you know I was going home because they live on 21st, I live in 17th in Pleasant City -- . . . .

THE DEFENDANT: So we're all going like kind of different directions. But Zeek was going to walk with me you know so I didn't have to walk by myself. . . .

THE DEFENDANT: So and he just grabbed me, and like I was kind of tussling with him to get a loose or whatever, and I grabbed the gun and I shot twice. . . .

[*Id.*, T. 1146-47].

THE DEFENDANT: . . . And I'm telling him you know "you're messed up" or whatever. And he just grabs me like -- like a bear hug type grab --

THE DEFENDANT: -- and I'm like struggling trying to get a loose, I'm wiggling and all --

DETECTIVE HARDIMAN: Now, your arms -- you mean he goes around the outside of your arms, and your arms are down like this?

THE DEFENDANT: My arms are down. . . .

THE DEFENDANT: So I'm like I'm wiggling and I'm like "chill out" or whatever whatever, and once I get a loose my gun was on my belt buckle –

THE DEFENDANT: -- right here, so I just shot twice, and I just ran.

[*Id.*, T. 1149-50].

THE DEFENDANT: I just shot twice. I didn't know like -- I seen him fall, but I didn't know where I hit him or if he was alive or not, I just took off.

[*Id.*, T. 1151].

At that point, Detective Hardiman told Petitioner he was trying to "figure out"

"what prompted [her] to make that decision to pull a gun out?" [*Id.*, T. 1151].

Petitioner responded:

19

THE DEFENDANT: Because he was acting like he really didn't want to let me go, you know what I mean? . . . .

THE DEFENDANT: He was just holding me and I'm like you know I'm wiggling, I'm trying to get away, I'm struggling because he's bigger than me. . . .

THE DEFENDANT: So I'm like trying to like sling him a little bit because my feet are still on the ground and so I'm just like trying to sling him off. . . .

THE DEFENDANT: And like when he – I finally kind of get him off to the side or whatever, I just pulled the gun out and I just shot twice, and I took off.

[*Id.*, T. 1151-52].

When Detective Hardiman asked Petitioner what she thought the victim's intentions were when he grabbed her around her arms, the following appears of record:

THE DEFENDANT: I don't know. I got scared. Because he had been picking at me all day, you know what I mean? Like –

DETECTIVE HARDIMAN: Right. But the thing that -- the thing that I'm trying to figure out is you know you describe it like a juvenile picking, you know? I mean if it -- if I was sitting here and I kept on telling you "KC, KC, --

THE DEFENDANT: No, that was --

DETECTIVE HARDIMAN: -- now I'm gonna fuck you up," or you know things like that, then you know I can see where you think well it's escalating. But the way you've described it to me --

THE DEFENDANT: No.

DETECTIVE HARDIMAN: -- kind of you know -- that's why I'm trying to figure out where you're at when this happens because you're describing it as he's just kind of picking at you.

20

THE DEFENDANT: Yeah.

DETECTIVE HARDIMAN: Yeah, like – like brothers and sisters do to each other --

THE DEFENDANT: Not like --

DETECTIVE HARDIMAN: -- kind of thing.

THE DEFENDANT: -- picking. It's picking --

DETECTIVE HARDIMAN: Uh-huh.

THE DEFENDANT: -- but like when you're tugging and you're pulling --

DETECTIVE HARDIMAN: Uh-huh.

THE DEFENDANT: -- that's what I mean by picking. I don't know like "you know KC, KC, KC" --

DETECTIVE MEYERS: Like a kid's grabbing your shirt like --

THE DEFENDANT: Like he's grabbing my shirt --

DETECTIVE MEYERS: -- pushing you?

THE DEFENDANT: -- he's grabbing my pants, he's like tugging on me like picking at me, you know?

DETECTIVE MEYERS: Okay.

DETECTIVE HARDIMAN: Uh-huh.

DETECTIVE MEYERS: And when you – when he's got you in the bear hug and you get him off balance, your feet are still on the ground?

THE DEFENDANT: My feet are on the ground.

DETECTIVE MEYERS: Does he fall on the ground?

THE DEFENDANT: No. He kind of was like off to the side, and then I just shot twice, and I took off.

DETECTIVE MEYERS: Okay. When you say you shot twice, are you right-handed or left-handed?

THE DEFENDANT: I'm right-handed.

DETECTIVE MEYERS: Okay. How if – if I'm him and I'm standing like this, and you wiggle me off, and I'm this way, how did you

with your right hand how did you shoot?

THE DEFENDANT: Well, my right hand --

DETECTIVE MEYERS: Did you go like this? Did you go like this?

THE DEFENDANT: When I shot him, I was standing straight up like we were kind of up there. Can I stand?

[*Id.*, T. 1155-57].

At that point, Petitioner demonstrated how the "struggle" between she and the victim took place [*Id.*, T. 1157-60].

Petitioner insisted, "I shot twice, and I took off" [*Id.*, T. 1159]; "I just shot twice, I seen him falling and I took off. I don't know if he was falling because I shot him or if I threw him off, I just shot twice and I took off." [*Id.*, T. 1160].

When asked if the victim was on the ground when she shot him the second time, Petitioner said, "I'm not sure. I shot twice and I took off. . . ." [*Id.*, T. 1169].

THE DEFENDANT: I shot twice, and then I didn't even pause or stop. I didn't wait, I didn't look to see. I took off. I was already scared. And then I just shot someone, you know you're gonna take off.

[*Id.*, T. 1171]. Detective Hardiman insisted:

DETECTIVE HARDIMAN: . . . Could the 1st round have gone off, and he falls on the ground, and then you don't know if he's -- is he trying to get -- to push back up, and you shoot another round?

22

THE DEFENDANT: **I don't know**. It happened fast. **I just know I shot twice**. And when I shot, he was like going down. I -- I don't -- I don't know, I just know I shot twice. And he was like off a little bit like to a stumble, that's all -- yeah.

[*Id.*, T. 1179].

When asked what Petitioner was "afraid of" causing her to shoot the victim, Petitioner responded:

DETECTIVE MEYERS: Okay. I know you said that when he puts his arms around you he grabs you, you said "I was afraid," what are you afraid of?

THE DEFENDANT: Like okay, me being gay or whatever --

THE DEFENDANT: -- a lot of dudes try me like that.

DETECTIVE MEYERS: Try you like?

THE DEFENDANT: Like you know like --

DETECTIVE MEYERS: Oh, you mean like they try because they want uh – explain what you mean.

THE DEFENDANT: They -- a lot of dudes try me.

THE DEFENDANT: They're like "oh, yeah, you know I could do this, I could do that, you're not really gay," or whatever whatever.

THE DEFENDANT: That's why I got you know -- first because another guy tried me like that.

DETECTIVE MEYERS: Uh-huh.

THE DEFENDANT: And like I'm not going to balk or whatever.

THE DEFENDANT: I was scared.

DETECTIVE MEYERS: So by him grabbing you based on your past -

THE DEFENDANT: But me and Antonio --

DETECTIVE MEYERS: -- experience?

THE DEFENDANT: -- we've had like when I first met Antonio –

THE DEFENDANT: -- Antonio said you know stuff like that like "you want to have sex with me," or whatever.

THE DEFENDANT: **But I didn't pay no attention to it because I told him I was like "no, I'm gay," or whatever**. And he was like "okay, you know that's cool whatever whatever." He's like "oh, my sister's gay." Like this woman, his sister -- I don't know how many sisters he have.

THE DEFENDANT: But he said his sister's gay, "you can meet my sister," and dah-dah-dah, and I'm like "no, I'm good" whatever you know and we'd laugh it off and we leave it at that.

THE DEFENDANT: And I seen him a couple of more times, then he's still being uh -- friendly or whatever whatever.

THE DEFENDANT: But this day it was just like really aggressive, you know?

DETECTIVE MEYERS: Well, you described it before it was like picking, but was he -- was he saying you know any -- was he saying "you want to have sex with you?" Was he --

THE DEFENDANT: No, he was just like grabbing and pulling on my clothes and stuff.

THE DEFENDANT: And like I would move to a different place or a different side.

THE DEFENDANT: Like whatever side I move to even -- this is when we were drinking like --

THE DEFENDANT: -- in his house.

THE DEFENDANT: Eventually me and Antonio would end up side by side shoulder to shoulder and like somewhere in the same (indiscernible 12:17:07 p.m.)

THE DEFENDANT: -- you know what I'm saying?

THE DEFENDANT: So like it started like I was getting kind of you know like "come on," like "back off, okay it's enough, just chill out."

DETECTIVE MEYERS: Were you getting annoyed by it?

THE DEFENDANT: Yeah.

DETECTIVE MEYERS: Making you angry?

THE DEFENDANT: **Yeah, a little bit**.

DETECTIVE MEYERS: Uh-huh. When he grabs you, is he -- did he say anything to you? When he actually ultimately puts you

in that bear hug, does he say anything to you?

THE DEFENDANT: No, he's just got his face like against my face and he's like -- you know what I mean?

DEFENDANT: So like I'm just trying to get away.

DETECTIVE MEYERS: Did he ever have -- did you ever see him have a weapon in his hands?

THE DEFENDANT: *No*.

DETECTIVE HARDIMAN: Do you think he was flirting with you?

THE DEFENDANT: In a way.

DETECTIVE HARDIMAN: Yeah? But you know did you tell that -- did you ever tell him that you weren't interested in him or --

THE DEFENDANT: Yeah.

DETECTIVE HARDIMAN: Okay.

THE DEFENDANT: He --

DETECTIVE MEYERS: She was saying she had a prior conversation with him --

DETECTIVE HARDIMAN: Oh, okay.

25

DETECTIVE MEYERS: -- when they first met. She said that you know "I'm gay, I'm not interested."

DETECTIVE MEYERS: Did he -- when he grabs you this morning uhm -- you said he didn't have a weapon, he didn't really say anything to you uhm -- and you're not sure what his intensions were, did you think he was going to like -- he was going to kill you or he was going to hurt you really bad by doing this bear hug?

THE DEFENDANT: Did I think he was gonna kill me?

THE DEFENDANT: No. Did I think he was gonna hurt me? Yes. Like if I were to have folded or just okay, yeah.

THE DEFENDANT: Like if I wouldn't put up a struggle, yes.

DETECTIVE HARDIMAN: But I mean if he's got you -- and say he -- if he's got you in the bear hug and you fold, you mean folded just like give up is how you mean?

THE DEFENDANT: Yeah.

DETECTIVE HARDIMAN: Don't you think Zeek and all them and Broderick would have helped you out? Do you think they would have? Are they your friends or his friends?

THE DEFENDANT: Broderick has known Antonio like way longer. They see themselves as brothers.

THE DEFENDANT: And Zeek is more of my friend. Like he's known Broderick -- I don't know how long he's known Antonio or whatever, but he's known Broderick I don't know for how long, but me and Zeek that's like my little brother, we hang out a lot. Like we do mostly a lot of stuff together. We do a lot of stuff together.

DETECTIVE HARDIMAN: So he would help you out no matter what?

THE DEFENDANT: Yes.

DETECTIVE HARDIMAN: Did he ever come over to you and help you?

THE DEFENDANT: No, he was still in the back.

26

DETECTIVE HARDIMAN: From the time he gets you in the bear hug to the time you shake him off, how long do you think that is?

THE DEFENDANT: I have no idea.

DETECTIVE HARDIMAN: Like a few seconds or a minute?

THE DEFENDANT: (no verbal response)

DETECTIVE HARDIMAN: Okay. Were you -- were you tussling with him for a long time to where you were winded like out of breath?

THE DEFENDANT: No. I was tussling to long enough to be like you know when you drink you're like you know dizzy.

DETECTIVE HARDIMAN: Enough is enough?

THE DEFENDANT: Yeah, like you're dizzy like you know stuff's moving and you're just like "chill out, back off" whatever.

[*Id.*, T. 1188 – 95].

Petitioner then "ran home, and I called somebody to pick me up to take me to my cousin's house because I was scared." [*Id.*, T. 1161]. When asked where the gun was now, Petitioner said she had no idea because she "threw it" when she was running, so she does not know the exact spot [*Id.*, T. 1165]. When the detectives ended the interview with Petitioner at the police station, they took Petitioner to the location she indicated that she threw the gun [*Id.*, T. 1231]. The two detectives were unable to locate the gun [*Id.*, T. 1232-33].

The victim's body was found laying on his back, and there was large amount of fishing equipment laying across [Vol. 4, T. 760]. A photograph of the scene

shows, the body, and against the wall there is a five-gallon bucket with fishing equipment in it, and a couple of fishing poles [*Id.*, T. 768].

Dr. Reinhard Motte, Associate Medical Examiner, ruled the cause of death to have been "multiple gunshot wounds" and the manner of death a "homicide" [Vol. 5, T. 842- 843]. Dr. Motte found a gunshot wound to victim's back [Vol. 4, T. 803]. And also a gunshot wound to his head, "above his left ear" [*Id.*, T. 816]. The bullet to the back penetrated the spinal cord at T-11, rendering him paralyzed immediately from the waist down [*Id.*, T. 813]. This gunshot wound, however, did not render him dead right there on the scene [*Id.*, T. 819].

The gunshot to the head, on the other hand, went through his brain, and immediately killed him [Vol. 5, T. 837, 839]. It was Dr. Motte's opinion that Antonio Bannister was shot in the back first [*Id.*, T. 844]. Then for the second shot, the shooter would have stepped up closer and shot Antonio in the head [*Id.*]. Dr. Motte opined that it would have been a "tough shot" to shoot the victim in the back and in quick succession in the head [*Id.*, T. 873]; this would not be "a reasonable explanation" in this case [*Id.*, T. 873].

### VI. Governing Legal Principles

A. <u>Standard of Review</u>

The court's review of a state prisoner's federal habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See*

28

*Abdul–Kabir v. Quarterman,* 530 U.S. 233, 246 (2007); *Ledford v. Warden, Ga. Diagnostic & Classification Prison,* 818 F.3d 600, 642 (11th Cir. 2016), *cert. den'd,* 137 S. Ct. 1432 (2017). AEDPA ensures that federal habeas corpus relief works to "guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *See Greene v. Fisher,* 565 U.S. 34, 38 (2011). This standard is both mandatory and difficult to meet. *White v. Woodall,* 572 U.S. 415, 420 (2014).

Deferential review under § 2254(d) is generally limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster,* 563 U.S. 170, 182 (2011); *Gill v. Mecusker,* 633 F.3d 1272, 1288 (11th Cir. 2011). To review a federal habeas corpus claim, the district court must first identify the last state court decision, if any, that adjudicated the merits of the claim. *See Marshall v. Sec'y, Fla. Dep't of Corr.,* 828 F.3d 1277, 1285 (11th Cir. 2016). The state court is not required to issue an opinion explaining its rationale, because even the summary rejection of a claim, without explanation, qualifies as an adjudication on the merits that warrants deference. *See Harrington v. Richter,* 562 U.S. 86, 100 (2011); *Ferguson v. Culliver,* 527 F.3d 1144, 1146 (11th Cir. 2008). Where the state court's adjudication on the merits is unaccompanied by an explanation, federal courts must "look through the unexplained decision to the last related state-court decision that does provide a rationale" and, "then presume that

the unexplained decision adopted the same reasoning." *Wilson v. Sellers,* 138 S. Ct. 1188, 1192 (2018). Thus, if the relevant state-court decision on the merits is not accompanied by a reasoned opinion, because it was summarily affirmed or denied, a federal court "should 'look through' the unexplained decision to the last state-court decision that does provide a relevant rationale." *Id.*

Where the claim was "adjudicated on the merits," in the state forum, § 2254(d) prohibits re-litigation of the claim unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or, (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Harrington v. Richter,* 562 U.S. at 97-98.

A state court decision is "contrary to" established Supreme Court precedent when it (1) applies a rule that contradicts the governing law set forth by the Supreme Court; or (2) confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law is different from an incorrect application of federal law. *Williams v. Taylor*, 529 U.S. at 410. Consequently, "[a] state court's determination that a claim lacks merit precludes federal habeas corpus relief so long as fair-minded jurists could disagree on the

correctness of the state court's decision." *Mitchell v. Esparza,* 540 U.S. 12, 16 (2003); *Tharpe v. Warden,* 834 F.3d 1323, 1337 (11th Cir. 2016), *cert. den'd,* 137 S. Ct. 2298 (2017) (accord). In other words, if the last state court to decide a prisoner's federal claim provides an explanation for its merits-based decision in a reasoned opinion, "a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers,* 138 S. Ct. at 1192. As applied here, to the extent Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under § 2254(d).

B. Ineffective Assistance of Counsel Standard

Here, Petitioner raises multiple claims challenging counsel's effectiveness. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them. *Strickland v. Washington,* 466 U.S. 668, 684–85 (1984). When assessing counsel's performance under *Strickland,* the court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. A § 2254 Petitioner must provide factual support for his contentions regarding counsel's performance. *Smith v. White,* 815 F.2d 1401, 1406–7 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *See Boyd v. Comm'r, Ala. Dep't of Corr.,* 697 F.3d 1320, 1333–34 (11th Cir. 2012).

31

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow,* 571 U.S. 12, 20 (2013). "Where the highly deferential standards mandated by *Strickland* and the AEDPA both apply, they combine to produce a doubly deferential form of review that asks only 'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Gissendaner v. Seaboldt,* 735 F.3d 1311, 1323 (11th Cir. 2013).

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) his counsel's performance was deficient, falling below an objective standard of reasonableness; and, (2) he suffered prejudice resulting from that deficiency. *Strickland,* 466 U.S. at 687-88. Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *Strickland* at 690-91. To uphold a lawyer's strategy, a court need not attempt to divine the lawyer's mental processes underlying the strategy, because there are "countless ways to provide effective assistance in any given case." *Strickland,* 466 U.S. at 689.

To establish deficient performance, the movant must show that, in light of all circumstances, counsel's performance was outside the wide range of professional competence. *Strickland, supra. See also Cummings v. Sec'y for Dep't of Corr.,* 588 F.3d 1331, 1356 (11th Cir. 2009). The Court's review of counsel's performance

should focus on "not what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." *Chandler v. United States,* 218 F.3d at 1313; *Burger v. Kemp,* 483 U.S. 776 (1987). Counsel is not ineffective for failing to raise non-meritorious issues. *Chandler v. Moore,* 240 F.3d 907, 917 (11th Cir. 2001). Counsel is also not required to present every non-frivolous argument. *Dell v. United States,* 710 F.3d 1267, 1282 (11th Cir. 2013).

Regarding the prejudice component, the Supreme Court has explained "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. A court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on one of the prongs. *Strickland,* 466 U.S. at 697. *See also Brown v. United States,* 720 F.3d 1316, 1326 (11th Cir. **2013).**

## VII. Discussion

In **claim 3**, Petitioner alleges that her right to a fair trial was violated when the trial court improperly instructed the jury. [ECF 1, p. 7]. Specifically, Plaintiff claims that the court erred by denying her request for a special jury instruction despite the fact that the standard instruction was misleading. [*Id.*]. She further claims that because she had no duty to retreat, the standard instruction is contrary to law.

[*Id.*]. As previously noted, Petitioner raised this claim on direct appeal, where the Fourth DCA *per curiam* affirmed her conviction without written opinion. *See Wright v. State*, 162 So.3d 1028 (Fla. 4th DCA 2015) (table).

A jury instruction that "was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 67 (1990) (internal citations omitted). Upon federal habeas review, a jury instruction is not judged in isolation but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. A defective jury charge raises an issue of constitutional dimension only if it renders the entire trial fundamentally unfair. *See Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983).

Here the jury instruction did not render Petitioner's trial unfair. Specifically, Florida Standard Jury Instruction 3.6(f), which discusses the justifiable use of deadly force, instructs the jury:

> In deciding whether defendant was justified in the use of deadly force, you must judge [him] [her] by the circumstances by which [he] [she] was surrounded at the time the force was used. The danger facing the defendant need not have been actual; however, to justify the use of deadly force, the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger **could be avoided only through the use of that force**. Based upon appearances, the defendant must have actually believed that the danger was real.

At trial, counsel requested a modification to the instruction, changing "could be avoided only through the use of that force" to "was real," so that in order to justify

34

the use of deadly force, the jury must find that the appearance of danger must have been such that "a reasonable cautious and prudent person...would have believed that the danger was real." [Vol. 6, T. 1050-53]. The court declined to modify the instruction, finding that the standard instruction was proper. [*Id.*, T. 1052].

Here, to the extent that Petitioner argues this instruction as error under Florida law, such a claim is not cognizable in this federal habeas petition. Whether the jury instructions comported with state law in Florida raises an issue that entirely depends on Florida law. Questions of state law, even when couched in terms of equal protection and due process, do not involve federal constitutional issues. *See Brown v. Warden*, 562 F. App'x 779, 781 (11th Cir. 2014) (unpublished) (citing *Williams v. Allen*, 598 F.3d 778, 800-02 (11th Cir. 2010)). Therefore, "[e]ven  if the determination of state law on...[a] claim[] on direct appeal was erroneous," an error of state law does not constitute a denial of due process. *See Barnhill v. Jones*, 2018 WL 9441324, *16 (N.D. Fla. Nov. 15, 2018) (citing *Swarthout v. Cooke*, 562 U.S. 216, 222 (2011)).

Further, there is nothing to suggest that the use of the standard jury instruction rendered Petitioner's trial fundamentally unfair. The phrase "could only be avoided through the use of that force" was part of the standard jury instructions at the time under Florida law. The Florida Supreme Court has held that this standard instruction "accurately and correctly explains this law to the jury with regard to the factually

35

complex situations where the jury must unwind the facts to determine who was the initial aggressor." *State v. Floyd*, 186 So.3d 1012, 1020-21 (Fla. 2016).

The trial court also specifically informed the jury, in accordance with the standard instructions, that (1) Petitioner **had no duty to retreat** if she was in a place she had a right to be and was not engaged in an unlawful activity, and (2) "based upon appearances, the [Petitioner] **must have actually believed that the danger was real**." [Vol. 9, T. 1612-13]. These portions of the standard instruction adequately covered counsel's proposed modification. The jury is presumed to have followed these instructions when evaluating the evidence presented at trial. *See, e.g., Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Consequently, Petitioner has not shown that any error in jury instruction "so infected the entire trial" that her conviction is a violation of due process. Accordingly, she fails to demonstrate under § 2254(d) that the state court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or that it was based on an unreasonable determination of the facts. Claim 3 should be denied.

In **claim 4**, Petitioner alleges that she received ineffective assistance of counsel when her lawyer stipulated to the edited 911 calls after objecting to the same call for relevance. [ECF 1, p. 8]. Petitioner claims this prejudiced her because the second caller stated they heard a female screaming before they heard two shots fired.

36

[*Id.* p. 9]. This call, Petitioner claims, would have been relevant to Petitioner's defense. [*Id.*]. In related **claim 5**, Petitioner alleges that her lawyer was ineffective for failing to request that both 911 calls be played in their entirety. [*Id.*]. These grounds, and the remainder of Petitioner's ineffective assistance of trial counsel claims, were raised in her Rule 3.850 motion [ECF 9-1, Ex. 9], the denial of which was affirmed by the Fourth DCA *per curiam. See Wright v. State*, 248 So.3d 1153 (Fla. 4th DCA 2018) (table).

Petitioner's claims are belied by the record. Counsel objected to the admission of the 911 calls at trial on the basis that the calls themselves were hearsay. [Vol. 3, T. 627]. In response, the prosecutor noted that this objection was "news to her" because counsel told her that he would stipulate to the entry of the 911 calls prior to trial. [*Id.*, T. 627-28]. Counsel then clarified that he stipulated only to the entry of the 911 calls to the extent that the prosecutor did not have to call the records custodian as a witness. [*Id.*, T. 628]. As to the issue of hearsay, however, counsel maintained the objection. [*Id.*]. The court then permitted the prosecutor to publish the calls to the jury "over objection" by the defense.

The first caller was Carolyn Glass, the woman to whom Ernest Coney reported the shooting immediately after it occurred. [*Id.*, T. 641-48]. Ernest Coney, the victim's son, is heard hysterically crying in the background of the call. [*Id.*]. The second call was by an unnamed caller, who reported that she heard two gunshots

fired and "a girl screaming." [*Id.*, T. 648-49]. After playing a portion of the call, the prosecutor stopped the call "by stipulation by [d]efense," and that the call was "dispatch at that point." [*Id.*, T. 649].

From review of the record above, it appears that counsel merely stipulated that (1) the prosecutor did not need to bring the records custodian to establish the admissibility of the 911 calls at trial, and (2) the end of the second call involving the dispatch did not need to be played to the jury. Counsel did not, however, stipulate to the admission of the calls themselves, and specifically lodged a hearsay objection to that effect.

Moreover, contrary to Petitioner's representation, the jury heard the portion of the second 911 call where the unnamed caller states that she heard a girl screaming and two shots fired. As such, the jury was not deprived of hearing the portion of the call that she claims was "relevant" to her defense. [ECF 1, p. 9]. Counsel capitalized on this statement during his closing argument, when he argued that Petitioner was the girl that the caller heard screaming prior to the shots being fired. [Vol. 9, T. 1643].

To the extent that Petitioner means to allege that counsel should have conducted a "subsequent investigation" into the caller, such a claim is without any evidentiary support. Petitioner's speculation as to how this unnamed, anonymous caller might have testified falls far short of the allegations necessary to establish

ineffective assistance of counsel. "Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation." *Aldrich v. Wainwright,* 777 F.2d 630, 636 (11th Cir. 1985).

Lastly, even assuming counsel improperly withdrew his objection to the admission of the 911 calls, there is plainly nothing in the record to suggest that the court would have sustained such an objection at trial. Clearly, the court believed the calls fell under a hearsay exception, and admitted them over defense's objection at trial. Moreover, the evidence at trial consisted of much more than the 911 calls. Particularly, the eyewitness testimony of three witnesses (Zeek, Broderick, and Coney) established that Petitioner was the shooter. Petitioner also confessed to being the shooter. [*Id.*]. Her whole theory was that she acted in self-defense. The 911 calls did not contradict that theory because they took place after the fact, and had nothing to do with the circumstances leading up to the shooting. Therefore, even if the 911 calls had been excluded at trial, Petitioner cannot demonstrate any prejudice because she fails to show that the outcome at trial would have been different but for counsel's alleged deficient performance. *See Strickland*.

Given the foregoing, the state court's resolution of the issues raised in claim 4 and 5 during Petitioner's state postconviction proceeding should not be disturbed

here. 28 U.S.C. § 2254(d); *Williams v. Taylor*, *supra*. Claims 4 and 5 should be denied.[3]

In **claim 6**, Petitioner alleges that she received ineffective assistance of counsel when her lawyer failed to object to the prosecutor's improper comments during closing argument. [ECF 1, p. 11]. Specifically, she claims that the prosecutor told the jury that "this was not a case of justification," which improperly influenced the jury to ignore the jury instructions. [*Id*.].  In related **claim 7**, she argues that she was prejudiced by the "cumulative effect" of her lawyer's failure to object to the prosecutor's improper statements during trial. [*Id*., p. 12]. Those "improper and prejudicial comments," she claims, included argument regarding the prosecutor's opinions, personal belief, and "adoption of the role as [an] expert witness." [*Id*.].

As an initial matter, except for Petitioner's claim that the prosecutor improperly stated that "this was not a case of justification," Petitioner fails to identify any particular statements in the record that she believes were improper and/or prejudicial. Such bare and conclusory allegations are insufficient to establish

---

[3] To the extent that Petitioner suggests in her traverse that the trial court's admission of the 911 calls violated the "Rule of Completeness" [ECF 11, p. 13], such a claim is without merit. She fails to identify, with any specificity, portions of the 911 call that were not played to the jury. As discussed above, the jury heard the portion of the second 911 call where the caller stated that she heard two gunshots and a girl screaming. Regarding the first call, it is clear that the child screaming in the background of the call is Ernest Coney. The caller, Carolyn Glass, states throughout the call that the boy is hysterical, and reported that his father had been shot. [Vol. 3, T. 643-44]. She even asks him on the call what his name is. [*Id*., T. 644]. There is, therefore, nothing in the record to suggest that the individual screaming in the background of the first call is anyone other than Ernest Coney. Petitioner's claim otherwise is pure speculation.

ineffective assistance. *See Boyd*, 697 F.3d at 1333–34. To the extent that she articulates all the improper statements made by the prosecutor in her reply [ECF 11, pp. 14-15], such allegations should not be considered. A traverse is not the proper vehicle to raise for the first-time facts to support a ground for relief. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994)

Regarding her claim that the prosecutor argued throughout her closing argument that Petitioner's actions were unjustifiable, such an argument is unpersuasive. The standard for federal habeas corpus review of a claim of prosecutorial misconduct is whether the alleged actions rendered the entire trial fundamentally unfair. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-45 (1974); *Hall v. Wainwright*, 733 F.2d 766, 733 (11th Cir. 1984). In assessing whether the fundamental fairness of the trial has been compromised, the totality of the circumstances are to be considered in the context of the entire trial, *Davis v. Zant*, 36 F.3d 1538, 1551 (11th Cir. 1983); and "[s]uch a determination depends on whether there is a reasonable probability that, in the absence of the improper remarks, the outcome of the trial would have been different." *Williams v. Weldon*, 826 F.2d 1018, 1023 (11th Cir. 1988).

Here, review of the record reveals that the prosecutor's statements during closing argument were anything but improper. It is worth noting that at the start of the trial, and again immediately before closing argument, the trial court clearly and

correctly instructed the jury that what the lawyers said was not evidence in the case and should not be considered as such [Vol. 3, T. 524; Vol. 9, T. 1618], and that the case must be decided only upon the evidence presented at trial. It is generally presumed that jurors follow their instructions. *See, e.g., Richardson v. Marsh*, 481 U.S. at 211.

Moreover, the prosecutor's comments that Petitioner's actions were unjustifiable, and consequently, constituted premeditated first-degree murder, when taken in context, were properly related to her argument that the state had satisfied its burden of proof. There is plainly nothing in the record to suggest that the prosecutor made these statements in a deliberate attempt to distract the jury or mislead the jurors as to issues of guilt or innocence. *United States v. Hall*, 47 F. 3d 1091, 1098 (11th Cir. 1995) ("Claims of prosecutorial misconduct are fact specific inquiries which must be conducted against the backdrop of the entire record.") (citations omitted).

Further, counsel objected during the prosecutor's closing argument no less than fourteen times, and many of those objections were based on alleged improper argument or misstatements of law. [Vol 9, T. 1625, 1628, 1630, 1685, 1690, 1691, 1692, 1697, 1699, 1700, 1701, 1702, 1704, 1707].  The court overruled nearly all the objections on the basis that argument, and reasonable inferences from the evidence, were permissible during closing. In fact, on one occasion, counsel objected to the prosecutor's statement that Petitioner's actions did "not rise to the level of

self-defense that is legally justified." [*Id.*, T. 1630]. In response, the court stated "[a]ll right. Again, the lawyers – my instructions on the law are what counts," once more indicating to the jury that the lawyer's statements during closing argument were not evidence to be considered. [*Id.*].

Considering the foregoing, Petitioner fails to demonstrate that the prosecutor's comments during closing argument were improper, rather than reasonable inferences from the evidence presented at trial. In context, the evidence at trial, through the testimony of multiple witnesses, established that Petitioner shot the victim unprovoked, and that she was not acting in self-defense at the time of the shooting. Accordingly, it was not improper for the prosecutor to argue that Petitioner's actions did not constitute the justifiable use of deadly force. The state court's resolution of these claims is therefore entitled to deference under § 2254(d). Claims 6 and 7 should be denied.

In **claim 8**, Petitioner argues that she received ineffective assistance of counsel when her lawyer failed to object to the court sustaining an objection the state never made to the second portion of her taped statement to police. [ECF 1, p. 14]. Specifically, Petitioner claims that while she was in the police interview room, a detective recorded a phone call she made to a family member in hopes that she would say something incriminating. However, because she continued to make statements

consistent with her self-defense statement during the phone call, the State argued that those statements should be excluded based on self-serving hearsay. [*Id*.].

Review of the record reveals that counsel asked to play the second portion of Petitioner's statement during trial, where she had a conversation with a family member over the phone. [Vol. 6, p. 1202]. Counsel argued that based on the rule of completeness, this portion of the statement should have been admitted. [*Id*., T. 1202-03]. The prosecutor responded, stating that she did not believe the rule of completeness applied because the officers were not questioning her at the time she made the phone call. [*Id*., T. 1203]. The court then sustained the state's "objection," but gave counsel the opportunity present further argument. [*Id.,* T. 1204]. Outside the presence of the jury, counsel questioned Detective Hardiman on the circumstances of the second portion of Petitioner's statement, presented further argument, and asked the court to reconsider its ruling. [*Id*., T. 1212-1230]. The Court reiterating its ruling would be the same; and declined to permit the second portion of the statement to be played to the jury. [*Id*., T. 1230].

It is clear from review of the record above that counsel vigorously attempted to have the court admit the phone call portion of Petitioner's statement, particularly because it bolstered her self-defense account, and made her look like a remorseful and sympathetic defendant. [*Id.,* T. 1220, 1229]. While the prosecutor did not use the key word "object" when she argued against the admission of the statement, she

made her position known to the court, and argued that the statements made during the recorded phone call were self-serving hearsay. [*Id*., T. 1202-03, 1215]. Nevertheless, the court declined to admit the second portion of the statement because it was repetitive of the statements made during Petitioner's interview with police.

Therefore, because the record shows that counsel vigorously attempted to admit the second portion of Petitioner's statement to police, he cannot be faulted for failing to do so. Petitioner's claims regarding counsel's alleged ineffectiveness on this issue are entirely belied by the record. To the extent that Petitioner means to raise a claim of trial court error for declining to admit the second portion of Petitioner's statement in violation of the rule of completeness, such a claim was never raised on direct appeal. [ECF 9-1, Ex. 6]. As such, it is unexhausted and procedurally defaulted from federal review. *See Castille v. Peoples,* 489 U.S. at 351; *Bailey v. Nagle*, 172 F.3d at 1302-03.

Given the foregoing, the state court's resolution of this ineffective assistance of counsel claim is entitled to deference under § 2254(d). *Williams v. Taylor, supra*. Claim 8 should, therefore, be denied.

In **claim 9**, Petitioner alleges her lawyer was ineffective for failing to (a) question Ernest Coney about moving the victim's body; and (b) move for a mistrial. [ECF 1, p. 15]. Petitioner further claims the discovery of this fact during trial was highly prejudicial because it would alter the opinions of the medical examiner and

an expert defense witness regarding the possible positions of the victim and Petitioner when the incident took place. [*Id.*].

Review of the record reveals that during Ernest Coney's testimony, he testified that after his father was shot, and Zeek, Broderick, and Petitioner fled from the scene, his father was on his side and Ernest turned him over. [Vol. 3, T. 682; Vol. 4, T. 712]. Outside the presence of the jury, counsel raised an issue regarding a discovery violation because Ernest had never said that he moved the victim's body prior to trial. [Vol. 4, T. 720]. After cross and redirect in front of the jury, the court conducted a discovery hearing [*Id.*, T. 739], and questioned Ernest regarding the circumstances of him moving the body. He explained that his father was "kind of on his side" and he rolled him over onto his back. [*Id.*]. Counsel also questioned Ernest, and Ernest stated that no one had ever asked him about touching his father's body prior to trial. [*Id.*, T. 743]. Thus, counsel ultimately conceded that there was no discovery violation because the state did not fail to disclose this particular "portion" of Ernest's testimony. [*Id.*, T. 744-45]. Having conceded that there was no discovery violation, counsel's performance cannot be deemed deficient for failing to move for a mistrial on this meritless issue.

However, even if counsel had pressed the issue further, and had further questioned Ernest in front of the jury regarding touching the body, there is nothing in the record to suggest that this testimony would have affected the outcome at trial.

46

Particularly, Reinhard Motte, the medical examiner who completed the autopsy, testified that he believed that the victim was first shot in the back, and then received a second shot to the head. [Vol. 5, T. 844]. The defense also presented the testimony of Michael Knox, a forensic consultant hired by the defense to do a reconstruction of the shooting. [Vol. 7, T. 1262]. Knox testified that he believed the most likely scenario was that the victim was first shot in the back, and as he began to fall to the ground, he was shot in the head. [*Id.*, T. 1263]. Knox's analysis accounted for the fact that the victim's body had been rolled onto his back after the shooting. [*Id.*, T. 1265, 1313].

Accordingly, Petitioner fails to demonstrate any facts to suggest that the mere fact that Ernest Coney rolled his father's body onto his back after the shooting would have altered the testimony of the medical examiner or the forensic consultant presented by the defense. Any claim otherwise is pure speculation and conjecture, without sufficient evidentiary support in the record. Accordingly, the state court's resolution of this claim is entitled to deference under § 2254(d). Claim 9 should be denied.

In **claim 10**, Petitioner alleges that she received ineffective assistance of counsel when her lawyer failed to strike four jurors for cause. [ECF 1, p. 17]. Specifically, she claims that the jurors who disclosed that they had an aversion to

carrying or using guns had a strong probability of being biased in Petitioner's case. [*Id*.].

A juror is competent under Florida law if he or she "can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court." *Carratelli v. State*, 961 So.2d 312, 324 (Fla. 2007). A juror must be excused for cause if any reasonable doubt exists as to whether he is impartial. *Banks v. State*, 46 So.3d 989 (Fla. 2010); *Bryant v. State*, 656 So.2d 426 (Fla. 1995). In the post-conviction context, "the evidence of [] bias must be plain on the face of the record." *Carratelli*, 961 So.2d at 324 (internal citations omitted).

Here, Petitioner does not name the jurors that she believes were biased in her case. The Respondent notes, however, that when Petitioner raised this claim in her Rule 3.850 motion, she named Wendy Evans, John Brooker, Myriame Jean-Pierre, and Lachandra Dukes as the jurors who noted that they had an aversion to carrying or using guns. [ECF 8, p. 74; ECF 9-1, Ex. 9, pp. 138-140].

Wendy Evans stated that she was uncomfortable around guns, but acknowledged that individuals have a right to defend themselves, and that she would defend herself if she could, depending on the situation. [Vol. 2, T. 351-53]. John Brooker stated that he owned guns, and was familiar with the law of self-defense in Florida. [*Id*., T. 430]. He did not believe that you needed to carry a gun in public,

but acknowledged that an individual has the right to defense themselves. [*Id.*, T. 431]. Brooker then clarified that if he were to hear that a gun was used in public, he would still be able to judge based on the evidence presented and follow the law. [*Id.*]. Lachandra Dukes stated that she owned a gun for protection [Vol 1, T. 301], and that her husband once had to point a gun at a woman who was possibly trying to break into their home in the middle of the night. [*Id.*, T. 302]. She stated that self-defense may be necessary depending on the situation, and that she was able to hold the state to their burden and apply the law as instructed by the judge. [Vol. 2, T. 435-36]. Lastly, Myriame Jean-Pierre talked about her brother's history with the criminal justice system, and stated that she didn't think the prosecutor's decision to charge him as an adult was "fair," but told him "you did the crime, so you should do the time." [Vol 1, T. 261-62]. Later, she stated that "[i]f you have to defend yourself, then you have to defend yourself," and further indicated that she would be able to follow the law as instructed by the judge. [Vol. 2, T. 362].

As discussed above, all four of the jurors stated that they could follow the law and the judge's instructions in rendering a just and fair verdict. There is simply nothing in the record to reflect that the jurors' comments regarding their personal feelings about guns or self-defense demonstrated any actual bias against Petitioner. As such, Petitioner cannot demonstrate that she received anything less than a trial by a fair and impartial jury.

Moreover, Petitioner stated that she agreed with the jury. [Vol. 2, T. 492]. Her consent to the selected jury "[is] probative of the reasonableness of the chosen strategy and of trial counsel's performance." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995); *see also Pitts v. Sec'y, DOC & Fla. Att'y Gen.*, No. 2:15-CV-13-FTM-29MRM, 2016 WL 128559, at *5 (M.D. Fla. Jan. 12, 2016) ("If the Defendant consents to counsel's strategy, there is no merit to a claim of ineffective assistance of counsel." (citation omitted)).

Given the foregoing, the state court's resolution of the issues raised in claim 10 during Petitioner's state postconviction proceeding should not be disturbed here. 28 U.S.C. § 2254(d); *Williams v. Taylor*, *supra*. Claim 10 should be denied.

In **claim 11**, Petitioner alleges that her lawyer was ineffective for failing to move to disqualify the trial judge from her case. [ECF 1, p. 18]. Specifically, she claims that during Petitioner's "Stand Your Ground" hearing, the judge made several statements about his personal feelings regarding the stand your ground law, and was dismissive towards every argument posed by the defense. [*Id.*]. Petitioner claims that this shows that the trial judge was biased against her, causing her constitutional rights to be violated. [*Id.*].

To warrant recusal of a judge, the Petitioner must demonstrate that the judicial bias stems from "extrajudicial sources," unless the judge's acts demonstrate "pervasive bias and prejudice" which unfairly prejudices one of the parties. *United*

50

*States v. Bailey*, 175 F.3d 966, 968 (11th Cir. 1999); *Braddy v. State,* 111 So. 3d 810, 833–34 (Fla. 2012). However, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *Liteky v. United States,* 510 U.S. 540, 555 (1994); *McWhorter v. City of Birmingham,* 906 F.2d 674, 678-79 (11th Cir. 1990). Further, "[a] judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune" from motions to disqualify. *See Liteky v. United States,* 510 U.S. at 556.

Review of the record reveals that the court's hearing on Petitioner's stand your ground motion lasted more than two hours. [ECF 10-1, p. 1]. At the hearing, the court expressed its belief that the stand your ground law applied situations dealing with "entry into a home." [*Id*., p. 4]. The state also expressed its position that the facts of the case did not even fall under the stand your ground law. [*Id*., p. 6]. Nevertheless, the Court held the hearing on the motion, where the defense presented the testimony of the medical examiner, Zeek, and Lieutenant James Smigel. On rebuttal, the state presented the testimony of Detective Dennis Hardiman, who testified that Petitioner told him that as they were walking back from fishing at the park, the victim grabbed her from behind, and the two tussled, after which Petitioner pulled out her gun from her waistband and shot the victim. [*Id*., pp. 76-80]. Petitioner did not testify at the hearing. [*Id*., p. 92].

The defense fervently argued that it had proved by a preponderance of the evidence, the applicable burden of proof under Florida law, that Petitioner was acting in self-defense at the time of the incident. [*Id.*, p. 97]. The state, on the other hand, argued that the medical examiner's testimony regarding the fact that one of the bullets entered through the victim's back showed that the shooting was not consistent with a struggle. [*Id.*, p. 98]. The Court then asked if the sworn testimony of Petitioner, who did not testify at the hearing, had been presented, and stated that he believed that some sort of sworn evidence by Petitioner was necessary in order for her to be immune from prosecution. [*Id.*, pp. 99-100]. The Court went on to weigh the credibility of all of the witnesses, determined that the defense failed to meet its burden, and stated that the case should go to the jury. [*Id.*, T. 110]. The Fourth DCA rejected Petitioner's challenge to the denial of her stand your ground motion on direct appeal. *See Wright v. State*, 162 So.3d 1028 (Fla. 4th DCA 2015) (table).

Here, there is nothing in the record to suggest that the trial court's statements during the motion hearing were evidence of bias or prejudice on the part of the judge. Rather, the record shows that the court carefully considered the testimony, and the arguments raised by both parties before denying the motion. Consequently, Petitioner has not shown extrajudicial evidence of bias, much less the type of pervasive bias required for recusal. Disqualification cannot be based on rumors or gossip, but rather must be based upon a defendant's "well-founded objective" fear

that he will not receive a fair hearing. *See* Fla. R. Jud. Admin. 2.160(d)(1); *Arbelaez v. State,* 898 So.2d 25, 41 (Fla. 2005); *State v. Shaw,* 643 So.2d 1163, 1164 (Fla. 4 DCA 1993). Petitioner has not demonstrated either in the state forum or in this habeas petition an objective fear that she would not receive a fair trial if the case went forward with the assigned judge. Consequently, the summary rejection of this claim, without explanation, during Petitioner's state habeas corpus proceeding should not be disturbed here. 28 U.S.C. § 2254(d); *Williams v. Taylor*, *supra*.

In **claim 12**, Petitioner alleges that the cumulative effective of counsel's errors deemed her trial and conviction fundamentally unfair. [ECF 1, p. 19]. When viewing the evidence in this case in its entirety, the alleged errors raised in this collateral proceeding, neither individually nor cumulatively, infused the proceedings with unfairness as to deny the movant a fundamentally fair trial and due process of law. Petitioner therefore is not entitled to habeas corpus relief. *See Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation), *overruled on other grounds, Slack v. McDaniel*, 529 U.S. 473, 482 (2000). *See also United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to Petitioner's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable.

*See Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). Accordingly, the state court's resolution of this claim during Petitioner's state habeas proceedings are entitled to deference under § 2254(d). Claim 12 should be denied.

## VIII.  Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the Petitioner to establish the need for a federal evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.,* 647 F.3d 1057, 1060 (11th Cir. 2011). To determine whether an evidentiary hearing is needed, the question is whether the alleged facts, when taken as true, are not refuted by the record and may entitle a petitioner to relief. *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016), *cert. den'd*, 137 S. Ct. 2245 (2017). The pertinent facts of this case are fully developed in the record before the Court. Because this Court can "adequately assess [petitioner's] claim[s] without further factual development," *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing is not warranted here.

## IX.    Certificate of Appealability

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *Harbison v. Bell,* 556 U.S. 180, 183 (2009). This Court should issue a certificate

of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, the Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel,* 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the Petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Upon consideration of the record, this court should deny a certificate of appealability. Notwithstanding, if Petitioner does not agree, she may bring this argument to the attention of the District Judge in objections.

## X.   Conclusion

Based upon the foregoing, it is recommended that this petition for writ of habeas corpus be denied, that no Certificate of Appealability issue and the case be closed.

Any party who objects to this recommendation or anything in it must, within fourteen days of the date of service of this document, file specific written objections with the court. Failure to do so will bar a *de novo* determination by the District Judge of anything in the recommendation and will bar an attack, on appeal, of the factual

findings of the Magistrate Judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn,* 474 U.S. 140, 149 (1985).

SIGNED this 28th day of May, 2020.

_____
UNITED STATES MAGISTRATE JUDGE

cc:    Kirby C Wright
       155943
       Florida Women's Reception Center
       3700 NW 111th Place
       Ocala, FL 34482-1479
       PRO SE

       Georgina Jimenez-Orosa
       Attorney General Office
       1515 N Flagler Drive
       Suite 900
       West Palm Beach, FL 33401-3432
       561-837-5000
       Fax: 837-5099
       Email: CrimAppWPB@MyFloridaLegal.com